UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                    )
BOSTON SHIP REPAIR, LLC,            )
                                    )
                  Plaintiff,        )
                                    )        CIVIL ACTION
            v.                      )        NO. 12-11098-WGY
                                    )
STARR INDEMNITY & LIABILITY COMPANY )
and NORTH POINT MARINE & INDUSTRIAL,)
INC.,                               )
                                    )
                  Defendants.       )
_____)
                                    )
STARR INDEMNITY & LIABILITY COMPANY,)
                                    )
                  Counterclaimant,  )
                                    )
            v.                      )
                                    )
BOSTON SHIP REPAIR, LLC,            )
                                    )
                  Counterclaim-     )
                  Defendant.        )
_____)
                                    )
NORTH POINT MARINE & INDUSTRIAL,    )
INC.,                               )
                                    )
                  Third-Party       )
                  Plaintiff,        )
                                    )
            v.                      )
                                    )
OCEAN SHIPS, INC.                   )
                                    )
                  Third-Party       )
                  Defendant.        )
_____)
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    February 20, 2014

**I.   INTRODUCTION**

On September 6, 2013, after a four-day bench trial in

admiralty,[1] this Court entered from the bench its findings of

fact and tentative rulings of law regarding Boston Ship Repair,

LLC's ("Boston Ship Repair") action for damages resulting from a

flooding incident on the USNS RED CLOUD (the "RED CLOUD").  See

Trial Tr. vol. 4, Sept. 6, 2013, ECF No. 109.  During this

September hearing, the Court tentatively ruled that the

---

[1] In Waring v. Clarke, 46 U.S. 441 (1847), the Supreme Court
held that the Constitution permits federal trial judges to be
the triers of fact in admiralty cases.  See id. at 460 ("We
confess, then, we cannot see how [admiralty cases] are to be
embraced in the seventh amendment of the constitution, providing
that in suits at common law the trial by jury should be
preserved.").  This precept is recognized by Federal Rule of
Civil Procedure 38(e), which states: "These rules do not create
a right to a jury trial on issues in a claim that is an
admiralty or maritime claim under Rule 9(h)."  Fed. R. Civ. P.
38(e).

There are two exceptions to this principle.  First,
Congress may pass statutes creating a right to trial by jury for
certain admiralty claims.  See Lily Kurland, Note, A Trying
Balance: Determining the Trier of Fact in Hybrid Admiralty-Civil
Cases, 90 Wash. U.L. Rev. 1293, 1299 (2013) (citing, for
example, the Great Lakes Act, 28 U.S.C. section 1873).  Second,
the right to trial by jury may apply when non-admiralty claims
are joined with admiralty claims to form a hybrid admiralty-
civil case.  See id. at 1303.

Neither exception applies here. The present case involves
only admiralty claims, none of which are associated with jury
rights by statute.  See Pls.' Compl. ¶ 5, ECF No. 1; Defs.'
Answer & Affirmative Defenses; Countercl. Declaratory J.; &
Third-Party Compl. Against Ocean Ships, Inc. ("Starr Indemnity &
North Point's Answer & Affirmative Defenses") 14, ECF No. 6.
Consequently, this Court is the appropriate trier of fact here.

"appropriate admiralty rule, where there is liability creating fault, is to assess comparative culpability." Id. at 16:18-20. The Court held that Boston Ship Repair, a ship repair facility that contracted to perform overhaul work to the RED CLOUD, is entitled to damages from North Point Marine & Industrial, Inc. ("North Point"), the subcontractor that performed the repair and replacement of certain of the RED CLOUD's motor-operated valves, and that North Point in turn is entitled to contribution from the RED CLOUD's owner, Ocean Ships, Inc. ("Ocean Ships"). Id. at 16:24-17:3; see also id. at 4:4-11. The Court assessed North Point's comparative culpability to be 25 percent and Ocean Ship's comparative culpability to be 75 percent. Id. at 17:3-5. Reserving the right further to amend its tentative rulings of law, the Court then invited the parties to submit post-trial briefs regarding the application of admiralty law to this case. Id. at 17:14-23. Having received these briefs and reflected on the arguments contained therein, the Court enters here its final rulings of law. This memorandum wholly adopts and does not further revise the Court's findings of fact entered from the bench on September 6, 2013.

## II.   RULINGS OF LAW

### A.   The Source of Each Party's Liability

Before proceeding to the ultimate question of what admiralty law applies to this case, the Court ought clarify the legal basis for each party's liability.

### 1.   North Point's Liability

As the Court has ruled, North Point was subject to a duty of workmanlike performance[2] in rendering its services to Boston Ship Repair.  Id. at 8:8-11.  In this context, the Court found that while in the RED CLOUD's engine spaces, North Point employee Matthew Slaven recognized that valve BW-V-1 was a motor-operated valve and tagged it for removal accordingly.  Id. at 11-12:15. When he realized later on that BW-V-1 was not called out as a motor-operated valve on the list he had been given, however, he did not report this omission from the list to his supervisor, Philip Trapasso.  Id. at 11:19-23.

In the course of entering these findings at the September hearing, the Court remarked from the bench that Mr. Slaven's actions were "negligent," id. at 11:23, and constituted a

---

[2] In their post-trial briefs, the parties refer at times to the "implied warranty of workmanlike performance," see Pl., Boston Ship Repair, LLC, & Third Party Def. Ocean Ships, Inc.'s Post-Trial Br. ("Ocean Ships Br.") 2, ECF No. 113, and the "implied warranty of workmanlike service or performance ('IWWP')," see Def./Third-Party Pls.' Post-Trial Br. ("North Point Br.") 1-2, ECF No. 114.  The Court treats these terms and the "duty of workmanlike performance" as one and the same legal doctrine.

"failure of workmanlike performance," id. at 12:8.  Upon
reflection, the Court realizes that these characterizations may
have created an impression that there are multiple grounds for
North Point's liability.  In the interest of clarity, the Court
now rules that Mr. Slaven's actions constituted a breach of the
implied warranty of workmanlike performance, and it appears that
no party contests this ruling.  The Court refrains from ruling
on whether Mr. Slaven's actions also constituted negligence.

### 2.   Ocean Ships's Liability

The Court also has ruled that Ocean Ships breached its
contractual obligations by preparing documents for Boston Ship
Repair and its subcontractors that erroneously failed to list
valve BW-V-1 as a motor-operated valve.  Id. at 8:11-9:13.  In
its oral remarks, the Court referred to this breach as
"negligent," id. at 9:1, but this or any other reference to
Ocean Ships in the context of negligence was a misstatement.
The Court dismissed North Point's tort claims against Ocean
Ships in its earlier order entered on July 19, 2013.  Order ¶ 3,
ECF No. 93.

More importantly, Ocean Ships contests that it is at all
liable to North Point.  First, Ocean Ships disagrees with the
interpretation of its contractual duty offered by the Court at
the September hearing.  The language at issue is contained in
paragraph 5.5 of the parties' work order regarding sea valve

inspection, which notes the following specification: "Ship's force to lock out/tag out and make safe all equipment pertaining to this work item." Starr Indemnity & North Point's Answer & Affirmative Defenses, Ex. 1, Item No. 0950 -- Sea Valves Inspection -- ABS -- USCG 0950-1, ECF No. 6-1. Ocean Ships argues that this language "should be read as a whole and not considered independent of the entire agreement." Ocean Ships Br. 8. This purportedly leads to a construction where "the requirement to 'make safe the equipment' only arises when the ship's force 'locks out/tags out.'" Id. at 9. Ocean Ships thus contends that "there is no freestanding requirement that the ship's force 'make safe the equipment.'" Id. at 10.

As the Court has explained, however, it gives the words in paragraph 5.5 their ordinary and normal meaning and consequently, "[i]t is the ship's force who are contractually obligated to make safe all equipment pertaining to this work item." Trial Tr. vol. 4, 9:20-22. In other words, there is a freestanding requirement -- which is not contingent on the ship's force locking out or tagging out the specified valves -- that the ship's force "make safe the equipment." The Court therefore is not persuaded to revise its original interpretation of Ocean Ships's contractual duty.

Ocean Ships's second argument is that it "cannot be found negligent in this matter because [Ocean Ships] was not on notice

prior to the incident that [valve BW-V-1] was omitted from the agreement with North Point." Ocean Ships Br. 7. Ocean Ships asserts that its duty of care for a "defective condition . . . not unique to the maritime context," id. at 7, is only triggered "when it has actual or constructive notice of [that condition]," id. at 7-8. This argument is immaterial, however, as it is premised on the Court having ruled that Ocean Ships was negligent. As explained above, the Court misspoke when it referred to Ocean Ships's contractual breach as negligent.

Moreover, if the Court applies Ocean Ships's notice argument to the matter of breach of contract, the Court's ruling on that issue also remains the same. It is true that Oceans Ships was unaware of the omission of valve BW-V-1. The Court acknowledged as much when it found that the omission was "inadvertent." Trial Tr. vol. 4, 8:22. The Court also noted that the contract at issue "is an extraordinarily complex and extensive document and inadvertent errors are expected to occur and in the contract documents are indeed provided for." Id. at 8:18-20. In interpreting the phrase "[s]hip's force to lock out/tag out," the Court gave credence to the fact "that the ship's force is most familiar with the valves in the interior of the vessel and the actual operation of the ship." Id. at 9:16-18. According to industry practice, the burden was on Ocean Ships to provide an accurate list of all the motor-operated

valves to be logged out or tagged out.  It is not sufficient for Ocean Ships to claim that it needed to be actively notified of an omission of a valve from the list.  This is especially true in light of the other key direction in paragraph 5.5, to "make safe all equipment pertaining to this work item."  Making safe the relevant equipment was an overarching, absolute duty for Ocean Ships, with no caveat requiring advance notification of defective conditions that might lead to a breach of that duty. The omission of valve BW-V-1 from the list provided to North Point helped cause "an extraordinarily dangerous event." Id. at 6:21.  Whether Ocean Ships knew of the omission is immaterial to evaluating its liability.  Given this interpretation, Ocean Ships's notice argument is unavailing on the issue of its contractual liability.  The Court here reaffirms its earlier ruling that Ocean Ships is liable to North Point as a contributor.

B.    **Determining the Appropriate Admiralty Rule**

1.    **The Ryan Doctrine of Warranty and Indemnity**

The Court now turns to the ultimate question -- the appropriate admiralty law to apply in this case.  The Court's tentative ruling in September was that "the appropriate admiralty rule, where there is liability creating fault, is to assess comparative culpability." Id. at 16:18-20.  Ocean Ships contests this ruling, arguing that North Point's liability ought

not be offset by any negligence or culpability on the part of
Ocean Ships or Boston Ship Repair.   Ocean Ships Br. 2-3.

To support its argument, Ocean Ships relies on a rule first
articulated by the Supreme Court in Ryan Stevedoring Co. v. Pan-
Atlantic Steamship Corp., 350 U.S. 124 (1956).  In Ryan, a
stevedore had improperly stowed on a ship a roll of pulpboard,
weighing about 3,200 pounds, that later broke loose and severely
injured a longshoreman.  Id. at 126.  The longshoreman sued the
shipowner, which in turn filed a third-party complaint against
the errant stevedore.  Id.  On appeal, the Supreme Court
affirmed the Second Circuit's holding that the shipowner was
entitled to indemnification from the stevedore.  Id. at 135.

In its decision, the Ryan Court made two related rulings.
First, it ruled that a stevedore's contract necessarily entails
a "warranty of workmanlike service that is comparable to a
manufacturer's warranty of the soundness of its manufactured
product."  Id. at 133-34.  The stevedore in Ryan breached this
warranty by failing to stow cargo "in a reasonably safe manner."
Id. at 134 (quoting and affirming the liability standard applied
by the Second Circuit to this case, sub nom. Palazzolo v. Pan-
Atlantic S.S. Corp., 211 F.2d 277, 279 (2d Cir. 1954)).  Second,
the Supreme Court ruled that the shipowner's own role in
contributing to the unseaworthiness of the ship or the injured

longshoreman's hazardous working conditions ought not bar its

recovery from the stevedore:

> Whatever may have been the respective obligations of
> the stevedoring contractor and of the shipowner to the
> injured longshoreman for proper stowage of the cargo,
> it is clear that, as between themselves, the
> contractor, as the warrantor of its own services,
> cannot use the shipowner's failure to discover and
> correct the contractor's own breach of warranty as a
> defense.  [The shipowner's] failure to discover and
> correct [the stevedore's] own breach of contract
> cannot here excuse that breach.

Id. at 134-35.  Together, these rulings establish a "combined

warranty/indemnity doctrine," Roderick v. Bugge, 584 F. Supp.

626, 631 (D. Mass. 1984) (Nelson, J.), under which any

stevedore's contract contains two implicit obligations: "first,

an agreement to perform its services in a workmanlike manner . .

. and, second, a promise to indemnify the shipowner for all

damages stemming from a breach of such warranty." Id. at 630-

31.  Courts have extended these principles to apply to non-

stevedore service contracts with shipowners more generally.  See

Maritime Overseas Corp. v. Northeast Petroleum Industries, Inc.,

706 F.2d 349, 353 (1st Cir. 1983) (collecting cases).

Invoking this doctrine, Ocean Ships argues that North

Point's liability for breach of its duty of workmanlike

performance cannot be offset by another party's negligence.  See

Ocean Ships Br. 2-5.  Ocean Ships relies in part on statements

made by the Massachusetts Appeals Court in <u>Curcuru</u> v. <u>Rose's Oil</u>

<u>Serv., Inc.</u>, 846 N.E.2d 401 (Mass. App. Ct. 2006):

> Given the First Circuit's continued recognition of the
> distinction between recovery in maritime tort, which
> is concerned with fault, and recovery under the
> implied warranty of workmanlike service in maritime
> contracts, which is concerned with control over the
> work, we reject the notion that comparative fault
> should apply to the shipowner's recovery when the
> implied warranty of workmanlike service has been
> breached . . . .

<u>Id.</u> at 413.

Naturally, North Point disagrees, specifically disputing

Ocean Ships's assertion that the indemnity prong of the <u>Ryan</u>

doctrine always entitles a shipowner to indemnification when a

stevedore breaches its implied warranty of workmanlike

performance.  <u>See</u> North Point Br. 4-5.  The First Circuit has

observed that "[a]pplication of <u>Ryan</u> indemnity has 'rested . . .

on elements of expertise, control, supervision and ability to

prevent accidents.'"  <u>Maritime Overseas</u>, 706 F.2d at 353-54

(quoting <u>Fairmont Shipping Corp.</u> v. <u>Chevron Int'l Oil Co.</u>, 511

F.2d 1252, 1257 (2d Cir. 1975)).  The Second Circuit has

elaborated on these criteria for a proper <u>Ryan</u> indemnity claim:

> [W]e find the crucial elements of <u>Ryan</u> to be as
> follows: a shipowner, relying on the expertise of
> another party (the contractor), enters into a contract
> whereby the contractor agrees to perform services
> without supervision or control by the shipowner; the
> improper, unsafe or incompetent execution of such
> services would foreseeably render the vessel
> unseaworthy or bring into play a pre-existing
> unseaworthy condition; and the shipowner would thereby

> be exposed to liability regardless of fault.  Where
> these elements are present, there will be implied in
> the contract an agreement by the contractor to
> indemnify the shipowner for any liability it might
> incur as a result of an unseaworthy condition caused
> or brought into play by the improper, unsafe or
> incompetent performance of the contractor.

Fairmont Shipping, 511 F.2d at 1258.

This analytical approach to Ryan indemnity is consistent with the underlying rationale for the doctrine, which "arises from the shipowner's nondelegable duty to provide a seaworthy vessel coupled with the fact that a stevedoring company which takes control of the ship to unload it is, during the course of that operation, more capable than the shipowner of avoiding accidents." Maritime Overseas Corp., 706 F.2d at 353.  The rationale actually is in keeping with the Massachusetts Appeals Court's holding in Curcuru.  That court ruled that in the case of a shipyard which had breached its duty of workmanlike performance when repairing a ship, the shipowner was entitled to Ryan indemnity from the shipyard because the shipowner "had no involvement with the repairs."  846 N.E.2d at 411.

Comparing these facts with those found in the present case makes it clear that Ocean Ships does not have the same entitlement to Ryan indemnity.  Unlike the shipowner in Curcuru, Ocean Ships was involved with the repairs of the RED CLOUD. First, Oceans Ships was obligated by contract to "lock out/tag out" the relevant equipment.  Trial Tr. vol. 4, 9:5-12.

Although North Point's employees participated in locking out and tagging out equipment, the process ultimately was Ocean Ships' responsibility.  Second, Ocean Ships prepared faulty specifications for North Point, creating a fatal defect in the information North Point relied on to execute its repair work. Id. at 9:12.  Finally, Ocean Ships was contractually obligated to "make safe" the relevant equipment, id. at 9:20-22, which goes to its overall obligation actively to maintain a safe work environment for North Point's employees.  Given this level of supervision and control, Ocean Ships cannot satisfy the criteria for a proper Ryan indemnity claim.

### 2.   Ryan Indemnity Does Not Apply to Property Damage Claims

Ocean Ships's level of control over the repair process is not, however, why Ryan indemnity does not apply in this case. The Ryan indemnity doctrine was "designed to serve special problems in maritime law arising from the absolute and nondelegable duty of seaworthiness."  Hobart v. Sohio Petroleum Co., 445 F.2d 435, 438 (5th Cir. 1971).  Those problems are not present in the instant case.  Cases that make no claim of personal injury to seamen or similarly situated workers do not implicate the doctrine of seaworthiness, making it inappropriate to impose Ryan indemnity.

The doctrine of seaworthiness articulates a specific cause
of action for seamen who are injured due to a defective
condition of their ship.  The concept was first recognized by
the Supreme Court in The Osceola, 189 U.S. 158 (1903), which
held that a ship and its owner were "liable to an indemnity for
injuries received by seamen in consequence of the
unseaworthiness of the ship, or a failure to supply and keep in
order the proper appliances appurtenant to the ship."  Id. at
175.  In Mahnich v. Southern Steamship Co., 321 U.S. 96 (1944),
the Supreme Court further explained that a shipowner must be
held strictly liable for any injuries a seamen receives due to a
ship's unseaworthiness, and that factors such as the shipowner's
due diligence or the crew members' negligence are irrelevant.[3]

---

[3] The doctrine of seaworthiness as a cause of action for
personal injury ought not be confused with the doctrine of
seaworthiness as a warranty in the carriage of goods on a ship.
In the latter context, "[t]he test of seaworthiness is whether
the vessel is reasonably fit to carry the cargo which she has
undertaken to transport."  The Silvia, 171 U.S. 462, 464 (1898).
This test focuses on the effect a defective condition of the
ship might have on its cargo, not on its crew and their safety.
The recognition of this warranty in the carriage of goods
predates The Osceola decision.  See, e.g., Flint v. Christall,
171 U.S. 187 (1898); The Silvia, 171 U.S. at 462; The Caledonia,
157 U.S. 124 (1895); The Edwin I. Morrison, 153 U.S. 199 (1894).
    In addition, unlike the doctrine of seaworthiness as a
cause of action for personal injury, the shipowner simply owes a
duty of due diligence to provide a seaworthy ship for the
carriage of goods.  See Flint, 171 U.S. at 192-93.  Given the
underlying facts of Ryan and the manner in which subsequent
cases like Maritime Overseas and Fairmont Shipping have
interpreted its rationale, it is reasonably clear that the Ryan

See id. at 100-01.  The potentially harsh consequences of imposing such absolute liability later were tempered by the Supreme Court's development and application of the Ryan indemnity doctrine, specifically "in situations when the shipowner has relinquished control of his vessel and another party is better situated to prevent losses caused by shipboard injuries."  Hobart, 445 F.2d at 438.

A cause of action based on the doctrine of seaworthiness, then, is a condition precedent to the application of Ryan indemnity.  While the Court recognizes that the flooding incident within the RED CLOUD was "an extraordinarily dangerous event," Trial Tr. vol. 4, 6:21, and that any seaman or worker present at the time could have been seriously injured, no one fortunately was.  Id. at 20-21.  This case does not involve a personally injured party seeking damages under an unseaworthiness cause of action.  This action is one to recover for damages that Boston Ship Repair paid to restore the RED CLOUD after the flooding incident.  Id. at 4:11-14.  It fairly can be characterized, then, as a property damage claim, and in maritime disputes between shipowners and stevedoring contractors over property damage claims, the First Circuit has "deem[ed] it improvident to apply the warranty liability created by Ryan."

---

doctrine does not pertain to seaworthiness in the context of the carriage of goods.

Continental Grain Co. v. Puerto Rico Mar. Shipping Auth., 972
F.2d 426, 439 (1st Cir. 1992).  This is consistent with the
judgment of other circuits.  See, e.g., Phillips Petroleum Co.
v. Stokes Oil Co., 863 F.2d 1250, 1256-57 (6th Cir. 1988);
Bosnor, S.A. de C.V. v. Tug L.A. Barrios, 796 F.2d 776, 785-86
(5th Cir. 1986).

This does not absolve North Point, however, of the first
prong of Ryan, a duty of workmanlike performance.  This Court is
persuaded by the Second Circuit's understanding in Fairmont
Shipping that the warranty element of the Ryan combined
warranty/indemnity doctrine simply "confirm[s] the applicability
to maritime service contracts of the hornbook rule of contract
law that one who contracts to provide services impliedly agrees
to perform in a diligent and workmanlike manner."  Fairmont
Shipping, 511 F.2d at 1259.  This part of Ryan "was merely
incidental to its particularized holding that the shipowner in
the circumstances there presented was entitled to indemnity."
Id.  It follows, then, that "the factors to be considered in
determining whether a contract includes a warranty of
workmanlike performance are entirely separate from the factors
that go into the determination of whether that warranty
encompasses an obligation to indemnify."  Id.

In Fairmont Shipping, which involved property damage but
not unseaworthiness, the Second Circuit held that the maritime

contract at issue contained an implied warranty of workmanlike performance even though there was no indemnity claim in the case.  Id. at 1259, 1261.  The Fifth Circuit also has made similar distinctions that decouple the implied warranty of workmanlike performance and Ryan indemnity.  See Agrico Chem. Co. v. M/V Ben W. Martin, 664 F.2d 85, 93-94 (5th Cir. Dec. 1981) (holding that the stevedore breached the implied warranty of workmanlike performance in its maritime contract but that, nevertheless, the shipowner was not automatically entitled to full indemnity).  Against this background, the Court reaffirms that North Point breached its implied warranty of workmanlike performance, but the Court also holds that Oceans Ships is not entitled to Ryan indemnity for the resulting property damage claims.

### 3.  Apportioning Fault in the Absence of Ryan Indemnity

If Ryan indemnity does not apply here, the question remains as to how this Court ought apportion liability and damages.  A Fifth Circuit decision, Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co., 651 F.2d 1096 (5th Cir. Unit A July 1981), provides the answer.  North Point rightly notes that this decision has been cited in three First Circuit cases: Parks v. United States, 784 F.2d 20, 26 n.7 (1st Cir. 1986), Maritime Overseas, 706 F.2d at 353, and Continental Grain, 972 F.2d at

437, 439.  See North Point Br. 6-7; Def./Third-Party Pl.'s
Addendum 1, ECF No. 116.  In Gator Marine, the Fifth Circuit
"question[ed] the vitality of Ryan principles in disputes
between a vessel and her stevedore over vessel and cargo
damage."  651 F.2d at 1100.  The opinion goes on to conclude
that "[d]isputes between vessels and stevedores over damaged
cargo are best accommodated by a straightforward application of
the usual maritime comparative fault system."  Id.

While both the vessel and stevedore in Gator Marine were
liable due to their negligence, id. at 1098-99, other appellate
decisions have assigned comparative fault liability based on
rulings even closer to those in the present case.  In Agrico
Chemical, 664 F.2d at 85, a property damage case, the Fifth
Circuit held that a stevedore breached its implied warranty of
workmanlike performance but also that the shipowner had been
negligent.[4]  Id. at 94.  The court applied the principle of
comparative fault and held the parties to be equally at fault,
thus dividing damages equally between them.  Id.  Similarly, in
the property damage case, Navieros Oceanikos, S.A. v. S.T. Mobil
Trader, 554 F.2d 43 (2d Cir. 1977), the Second Circuit affirmed
the apportionment of comparative fault liability between a tank

---

[4] The court appears to have ruled the stevedore both
negligent and in breach of the implied warranty of workmanlike
performance.  Agrico Chemical, 664 F.2d at 94 ("Brent was
negligent in loading the cargo. As a stevedore, Brent violated
its duty of workmanlike performance.").

barge that breached its implied warranty of workmanlike performance and a shipowner that was negligent.  Id. at 46-47.

The main distinction between these and the present case is that here, the shipowner, Ocean Ships, is liable due to its breach of contract, not due to its negligence.  This Court appreciates that the application of comparative fault between two parties in breach of contract, rather than between two joint tortfeasors, may appear highly unorthodox, especially in light of the fact that common law typically does not recognize the role of fault in contract law.  See Restatement (Second) of Contracts ch. 11, intro. note (1981) ("Contract liability is strict liability.  It is an accepted maxim that pacta sunt servanda, contracts are to be kept.  The obligor is therefore liable in damages for breach of contract even if he is without fault . . . ."); 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.8, at 195-96 (3d ed. 2004) (stating that "contract law is, in its essential design, a law of strict liability, and the accompanying system of remedies operates without regard to fault").

Common law, however, is just one of several elements of the overall makeup of maritime law.  "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules."  East River S.S. Corp. v. Transamerica Delaval,

<u>Inc</u>., 476 U.S. 858, 864-65 (1986).  In particular, "the general maritime law of contract comprehends common law doctrines of contract law as well as doctrines peculiar to admiralty." Thomas Schoenbaum, <u>Admiralty & Maritime Law</u> § 5-1 (5th ed. 2012).  One such doctrine endorses the relevance of comparative fault to damage allocations.  The Supreme Court first undertook this approach to maritime liability in <u>United States</u> v. <u>Reliable Transfer Co.</u>, 421 U.S. 397 (1975), ruling:

> We hold that when two or more parties have contributed
> by their fault to cause property damage in a maritime
> collision or stranding, liability for such damage is
> to be allocated among the parties proportionately to
> the comparative degree of their fault, and that
> liability for such damages is to be allocated equally
> only when the parties are equally at fault or when it
> is not possible fairly to measure the comparative
> degree of their fault.

<u>Id.</u> at 411.  The <u>Reliable Transfer</u> Court reasoned that the prior rule of divided damages in maritime collisions "was an ancient form of rough justice, a means of apportioning damages where it was difficult to measure which party was more at fault."  <u>Id.</u> at 403.  In the modern era, that rule no longer achieves "the just and equitable allocation of damages."  <u>Id.</u> at 411 (internal quotation marks omitted).  Instead, "that goal can be more nearly realized by a standard that allocates liability for damages according to comparative fault whenever possible."  <u>Id.</u>

Since <u>Reliable Transfer</u>, courts readily have applied a rule of comparative fault liability to maritime cases involving

property damage.  See, e.g., Gator Marine, 651 F.2d at 1096;

Agrico Chemical, 664 F.2d at 85; Navieros Oceanikos, 554 F.2d at

43.  The Fifth Circuit even has adopted comparative fault

liability in maritime personal injury cases.  See Loose v.

Offshore Navigation, Inc., 670 F.2d 493, 502 (5th Cir. 1982);

Leger v. Drilling Well Control, Inc., 592 F.2d 1246, 1249 (5th

Cir. 1979) ("The reasoning of Reliable Transfer loses none of

its cogency in the context of a non-collision personal injury

case.").  Taking stock of these cases, the Eleventh Circuit has

concluded that "[t]he clear trend in maritime cases is to reject

all-or-nothing or other arbitrary allotments of liability in

favor of a system that divides damages on the basis of the

relative degree of fault of the parties."  Smith & Kelly Co. v.

S.S. Concordia TADJ, 718 F.2d 1022, 1030 (11th Cir. 1983).

     Given this trend, along with the specific practice

established in other circuits of applying comparative fault in

property damage cases where one of two parties is in breach of

contract, this Court only slightly extends the reasoning of

Reliable Transfer by deciding to apply comparative fault in a

property damage case when both parties are in breach of

contract.  The policy goal endorsed by the Reliable Transfer

Court -- a just and equitable allocation of damages -- is best

achieved by dividing damages according to the comparative fault

of North Point and Ocean Ships for contributing to the RED CLOUD

flooding incident.  The Court apportions such fault based on the findings of fact it entered last September, particularly the finding that the "key fault" for not tagging out the BW-V-1 valve lies with Ocean Ships.  Trial Tr. vol. 4, 15:14-15.  Based on these facts, the Court adheres to its initial ruling: North Point is 25 percent liable and Ocean Ships is 75 percent liable for damages in this case.

### C.   North Point's Arguments Regarding Boston Ship Repair's Liability and Prejudgment Interest

Two additional matters ought briefly be mentioned here.  In its post-trial brief, North Point claims that Boston Ship Repair has admitted liability for at least part of these damages. North Point Br. 10.  This claim is based on a statement made by Boston Ship Repair and Ocean Ships in their joint post-trial submission that "a shipyard steps into the shipowner's shoes when the shipyard is accountable to a shipowner for breach of a contract for services due to a contractor's breach of the implied warranty of workmanlike performance."  Ocean Ships Br. 4.  North Point also claims that the Court ought reconsider awarding Boston Ship Repair prejudgment interest because "Boston Ship Repair/Ocean Ships has consistently without wavering sought 100% of RED CLOUD flood repair damages from North Point and not a penny less."  North Point Br. 10.  This purportedly triggers the type of "peculiar or exceptional circumstance" that might

warrant denial of prejudgment interest.  <u>Id.</u> (internal quotation marks omitted).  Neither of North Point's claims here are sufficiently developed or substantiated to merit consideration, nor do they sway any of the Court's decisions.

The Court does, however, agree with North Point that January 8, 2012 is the most reasonable date on which to commence prejudgment interest.  <u>See id.</u> at 11.  Per the Court's findings entered in September, this prejudgment interest has accrued at 4 percent since January 8, 2012 and ceases as of entry of judgment.  <u>See</u> Trial Tr. vol. 4, 18:6.

## III. CONCLUSION

Accordingly, for the reasons stated above, judgment will enter for Boston Ship Repair, with Ocean Ships liable for 75 percent of the damages and North Point liable for 25 percent. Prejudgment interest shall be calculated at the rate of 4 percent per annum since January 8, 2012.

The parties shall submit a form of judgment within 30 days of the date of this order.

**SO ORDERED.**


/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE